EXHIBIT 1

# Superior Court of Washington
# County of King

| | |
|---|---|
| In re the Matter of: | **19 - 2 - 0 0 8 9 2 - 0 KNT** |
| | No. |
| Colleen Parris | |
| Plaintiff, | **Complaint** |
| and | |
| Jacobs Engineering Group Inc. | |
| Defendant. | |

## I. Jurisdiction

1. The plaintiff, Colleen Parris, resides in King County, Washington.

2. The defendant, Jacobs Engineering Group Inc., is a corporation formed under the laws of the state of Delaware, it's principal place of business is in Dallas, Texas, but it has offices in the state of Washington and conducts business in Washington state, in which state, the alleged conduct occurred, giving rise to this complaint, and thus, jurisdiction in the state of Washington.

## II. Background Facts

Plaintiff started work for Jacobs on November 13, 2000.   She held several job positions at Jacobs Engineering with her most recent job title as Sr. Project/Controls Manager. During her employment, it was noted by Plaintiff's supervisors that she had strong communication, organizational and managerial abilities.   During her tenure with Jacobs, Plaintiff had a

*Complaint- Page 1  of 23*                    ORIGINAL

management role in many challenging projects including two difficult Jacobs' Brightwater contracts.  She was acknowledged to be an asset to the Jacobs' team.

## Plaintiff's Background

Plaintiff succeeded in business despite suffering from Post-Traumatic Stress Disorder (PTSD) caused in early life.  Through-out her adult life, she has successfully worked in high stress full-time positions.  During inappropriately hostile, discriminatory and abusive episodes at work, Plaintiff has experienced the following symptoms:  physical trembling and shaking, sweating, difficulty communicating, feeling overwhelmed, crying, and feeling very unsafe.  At times she would react with uncontrollable emotional outbursts.  She requires medical treatment when such unlawful traumatic events exacerbate her condition.

Situations that cause exacerbations include the following:  when she feels threatened by a male taking an aggressive posture (standing over her and yelling at her); being trapped and not allowed to take a break from a hostile situation that triggers an exacerbation of her PTSD; being pressured to allow her supervisor to kiss her on the mouth; being subjected to invasive or offensive sexual talk in the workplace; being required to physically compliment (appearance and clothing) her boss (Jim Pace).

Up until 2009, Plaintiff was managing her PTSD and working successfully in a very stressful, demanding position.  Her job was challenging and she flourished.  However, in 2010, Plaintiff' work environment began to change and she began to feel the effects progressively disabling her.

## 2009-2011

By 2009, Plaintiff was also experiencing a high level of stress dealing with the East Project Representative, Leon Maday.  Mr. Maday was known by staff to be terribly abusive. Several staff refused to work with him, and Megan Pence was present during many of his tirades of abuse spewed at Plaintiff.  Mr. Maday belittled Plaintiff, was abusive, and a threatening posture and tone when communicating with her.

Plaintiff continued to voice her concerns about Mr. Maday to Jacobs' management.  It turned into an office joke that Plaintiff always had to work with the "most abusive project managers."  Despite this environment, Plaintiff received high marks on her PA review.  Her review corroborated that she was working on the contract that was "the most personality driven." The review included supervisor's remarks of "performed well and remained professional with the client and contractor under these circumstances."  She mentored Megan Pence, whom she had recruited to Jacobs after Ms. Pence was to end her internship with King County, again demonstrating that she successfully managed her PTSD with client and employee relations despite the known abuse by Mr. Maday.  Performance assessments receive 2nd level management review.

Plaintiff reported Mr. Maday's abuse to Supervisor Kevin Rowland and Office Manager Karen Takagi, with Mr. Rowland commenting, "you are the only one who can take his abuse."

Plaintiff went through a divorce due to domestic violence.  The divorce was acrimonious and Plaintiff was forced to obtain temporary and permanent restraining orders to protect herself. Her work continued to receive excellent reviews.

### 2011-2012

In 2011, Plaintiff received a safety award for her efforts in Jacobs' Safety Program Beyond Zero.

*Complaint- Page 3 of 23*

Again, Plaintiff received a very strong performance rating by Manager Ven Hung Tseng:

> Another great year for Colleen.  She has been successfully handed over with new assignments within the Brightwater Project and maintains her excellent performance for not only the Contract Administration matters but also promoting Beyond Zero spirit among co-workers.

She received a salary increase to a bi-weekly rate of $3993.44.

She continued to excel in her position.

### 2013

On September 3, 2013, Plaintiff received another strong performance rating by Supervisor Ven Hung Tseng for the review period 5/21/2012-5/31/2013:

> Colleen was tasked with assisting the closeout of two most difficult Brightwater contracts…maintained organized records for both which have been very useful for the King County legal team.  She also took leadership in heading up IPS closeout and effectively organized, assigned and tracked necessary tasks.

Plaintiff's work continued to exceed expectations resulting in Plaintiff's assignment to the Seattle Seawall Project, however, it was delayed which led her to be requested to handle proposals and interviews with clients landing several including the Seawall and Denny Network and Substation.  Plaintiff was assigned to the position of Jacobs' PNW Internal Project Controls Manager for Global Buildings North America CM Division.  She was able to manage a high stress workload and her manage her PTSD.  At the close of 2013, the week before a holiday break, Jim Pace, Operations Manager told Plaintiff that he could tell she had "been abused in her personal life."  He also indicated he thought another woman in the office was abused as well, Kim Langenberg.

*Complaint- Page 4 of 23*

Pace's invasive remarks continued.  He told Plaintiff that he knew her job was difficult and he "would not take advantage of her."  However, he continued to require Plaintiff to handle Jacobs' staff relations outside her job description and on her own time, including but not limited to requiring Plaintiff to work over the Christmas holiday break with no pay when the company was "shutdown" for all overhead billing.  The more time Plaintiff had to work with him, the more he told Plaintiff and Paige Gill unwanted stories of his sexual conquests.   Stories included going on about having companies provide housemaids that were prostitutes.  He discussed how he and his co-workers were constantly visiting strip clubs, etc.   Mr. Pace would frequently inquire about Plaintiff' dates and boyfriends and during conversations with Plaintiff such as "can he ring your bell?" with obvious sexual suggestions.

**2014**

In May 2014, Plaintiff continued working with Jim Pace, and suffered extreme distress as she had to raise questions that touched on Jacobs' ethics when Jacobs started to manipulate billing time to contracts and adding on work to companies when they had signed a "no compete clause".  Her concerns were left unaddressed and David Gunn continued to do business and market and "combine" contracts that were not reasonably related.

Jacobs continued to add on work and bill the client, Microsoft for Mr. Gunn's time on non-Microsoft projects when he was cut out of the Boeing Program billing.  The expectation of Plaintiff to continue with financial practices that appeared to be unethical caused her great distress and terror and aggravated her PTSD.

Global Buildings North America were building the Boeing 777X team and more project controls were needed.   Jacobs hired Paige Gill and upper management evaluated overhead costs and cut funding.   This eventually led Plaintiff to accept a position with the Seattle City Light project managed by Jack Schwaegler.

On June 15, 2014, during Plaintiff's performance reviews, **Charles Nethery, Jacobs' Western Regional Project Controls Manager's Supervisor, noted that Plaintiff should be assigned at a higher level and be replaced for organic growth and training.  He further stated that she was a "terrific employee and wanted to further discuss her immediate career and advancement."** Soon after, Plaintiff began training in Deltek to manage the rolling forecast.   During this time, she observed that there was great deal of inappropriate billing on large government contracts (Bonneville Power Administration) to cover staff salaries.   Almost the entire time Jim Pace was working on Boeing with David Gunn, he was billing his Boeing time to Bonneville Power Administration and to the Company overhead budgets on that project, which appeared inappropriate to Plaintiff.   All the while, he was withholding funds in the profit reporting to create his own discretionary personal spending account.   In this office, Plaintiff observed that intercharging between projects was a standard practice even if the employee was not working on the project, depending upon which client had the most discretionary funds available.   Plaintiff was directed to participate in such questionable activities, terrifying her and aggravating her PTSD.

September 15, 2014:  Supervisor Kent Pimentel gave an overall excellent performance rating of 4.  Her managers comments included notations about a great work ethic, organized, managed time effectively, prioritized and focused, problem solved, and made sound, logical

decisions resulting in positive outcomes.  In particular, Jim Pace's note was included as reference to Plaintiff trying to set appropriate boundaries for conduct in the office:

> As other evaluators wrote, "solid, knows boundaries and most importantly what's acceptable and what's not."

This was a terrifying time as Plaintiff could see the financial and personal patterns of conduct of managers she was working with, David Gunn and Jim Pace, each of which had their own separate and damaging gender discrimination and inappropriate sexual behaviors in the workplace. **David Gunn kissed his female employees, including Plaintiff, on the lips when greeting and referred to the female employees as "his girls".**  Jim Pace discussed his sexual conquests and engaged in conversation to evaluate every female that walked in the office and discussed with Plaintiff know whether they were smitten with him or not as "he could not tell by the look in their eyes."  It was a condition of employment to tolerate this conduct, to submit to the club, with the escalating rules of inappropriate sexual and unethical conduct.

### 2015

Plaintiff' job required her to track where Jim Pace worked, billed his time, and spent "his money" and she was directed to draw down profit from projects that he was not truly working on. The pressure of anxiety of exposing his practices was building to the breaking point and her objection was becoming more apparent.

November 16, 2015 Performance Review by Supervisor Jack Schwaegler, was lowered to a performance rating of 3.  He justified that saying that management directed managers to issue no better than a rating of 3.  Mr. Schwaegler stated that in their short time together she had shown nothing but competence.  Jim Pace made a notation on her performance review and stated that she needed to "improve" in the ability to step back and address items unemotionally and

*Complaint- Page 7 of 23*

simply from a "business perspective."  This appeared to be a threat to stop raising issues of his conduct or ethics.

There was difficulty right off the bat transitioning onto the SCL program where project manager (Jack Schwaegler) and NAI program controls manager (Dawn Gamler) were communicating only with great tension.  Mr. Schwaegler had no plan, had not been trained, and did not know the company procedures and was having great difficulty managing even the proposal process, yet Jacobs continued to allow him to give proposals to the client.  Plaintiff mentored him at the request of Dawn Gamler and Jim Pace, to the best of her ability.  Jim Pace told Plaintiff to ask Mr. Schwaegler to visit with him so that he could train him in program controls rather than project controls at the beginning and offered his help to Dawn Gamler.  Plaintiff's judgment and experience were overridden by the male colleagues.  Their directives were frequently against her knowledge of policy and procedure.  Mr. Pace did not expect this "loyal servant" compliance from Plaintiff' male counterparts. Plaintiff felt like he treated her as a possession or personal assistant.  Mr. Pace went so far as to demand that Mr. Parris defend him against rumors that he was having affairs in the office as well as cover up issues with other female employees.  Mr. Pace's conduct was highly inappropriate and fueled the hostile work environment and extreme dysfunction.

At the end of 2015, Plaintiff prepared a presentation to SCL.  She proposed using a project management control system, within the first ½ hour of the meeting the client agreed to use Jacobs Prolog.  Within 2 weeks Jacobs had a live site and customization which was originally scheduled to be completed within 2 months based on the client's needs.  In addition, she managed staff.  Plaintiff was clearly the manager with knowledge, ability and client confidences.

*Complaint- Page 8 of 23*

### 2016

However, in January 2016, Jack Schwaegler was replaced by Jonathan Addison without considering other candidates or allowing applications.  Plaintiff was not considered and was by-passed for the position she was highly qualified for.  It was known to all that Mr. Schwaegler and Mr. Addison were friends outside of work as he recruited Addison.  At that point, Plaintiff had spent 608 months managing client needs, doing project instruction, advising and training staff, acting in a project and program manager role.  She was experienced in setting up a program and managing client projects.  Addison considered her a threat and turned up the pressure on her and other women.  From January to May, Plaintiff health deteriorated in discriminatory hostile work environment.

### Opposing Discrimination

By May 23, 2016, colleague Connie Krier was forced to quit because she kept experiencing discriminatory behavior with her male counterparts.  Ms. Krier asked Plaintiff to submit a statement to Connie Krier via email as to the gender discrimination she witnessed and experienced.  After submitting her statement, Plaintiff observed a sudden increase in Mr. Addison's hostile behavior toward her.

### Retaliatory Demotion After Opposition To Discrimination

Jonathan Addison met with Plaintiff on March 7, 2016.  During this meeting, he called Shawn Henry, the resident engineer into the meeting and presented a new organizational chart that demoted Plaintiff to an administrative assistant.  There was no change in pay but there was a significant change in her job status.  Plaintiff was removed from her worksite and placed in a cubicle in Bellevue.  She was isolated and segregated, and co-workers were told not to speak to

*Complaint- Page 9 of 23*

her.  Due to Plaintiff' opposition to discrimination, her gender, her supervisor experience and her ethics, Mr. Addison used his power to "put her in her place", under his thumb; isolated and shunned.

Jonathan Addison has a well-known history of abuse, gender bias and retaliatory behavior.  At least six female colleagues openly support Plaintiff' claims of hostile work behaviors such as screaming, yelling at women employees and treating female colleagues differently than male colleagues.

No one at Jacobs Engineering advocated for Plaintiff.  Management allowed Mr. Addison to discriminate and retaliate against Plaintiff and subject her to excruciating humiliation. Due to Mr. Addison's discrimination and retaliatory behavior, Plaintiff experienced a severe exacerbation in her PTSD.

### Permanent Aggravation of Medical Conditions

On March 14, 2016, Plaintiff was seen by Dr. Brender for exacerbation of PTSD, triggered at work.  Symptoms included panic attacks.  Dr. Brender recommended that Plaintiff reduce her schedule to part time and discontinue her work with Jonathan Addison.

She continued to treat concurrently with a psychiatrist and psychologists during the exacerbation.  On May 10, 2016, Dr. Brender completed a FMLA form and noted:

PTSD with significantly worsening depression and anxiety related to reported hostile work environment.  Dr. Brender recommended **part time work** from May 2 through June 30, 2016 with weekly doctor's visits.

Jacobs was aware of Plaintiff's preexisting PTSD and she continued to advise them of her status during her leave.  There was no interactive process to remedy the work environment and supervisory methods that were making her ill.  As a result, Dr. Brender reduced Plaintiff' work

*Complaint- Page 10  of 23*

hours to part time (4 hours per day). However, Jacobs did not return her to work part time with accommodation. Jacobs put Plaintiff on leave and while she was on leave, Jacobs management recruited her to be the Project Controls Manager for Tacoma Amtrak Cascades Station for WSDOT.  Plaintiff returned to work full time on May 23, 2016 in the Bellevue office in the role of Project Controls.

A September 12, 2016 performance review by 2nd level Supervisor Jay Hueter, gave her a performance rating of 3 (fully performing).  Mr. Hueter noted that Plaintiff took ownership of Prolog development and training, positively influenced the team to use SPA's and SOR's (which all team members had difficulty utilizing).  Also noted was her involvement in several project management tasks such as Jacobs procedures, cost accounting, project procedures manuals, invoicing, etc.  He noted that she was organized and had good follow through, with the decisions she made based on core values, and *"definitely no lack of courage."*  It was also noted that *Plaintiff wanted to revisit the issue of gender based discrimination in the office.*

### WSDOT Project

On December 15, 2016,  while working on the WSDOT Tacoma Amtrak Cascades Station Project, Plaintiff observed dead mice in the heating/cooling ceiling vent in Suite 204 at the Freight House Square.  Plaintiff asked Nicole Knudson to speak with the building manager and have the mice removed.  There was a rodent problem in the building where she was assigned to work.  The mice were located 3 to 4 feet from Plaintiff' head the entire time she was in the building.

On January 18, 2017, Plaintiff was ordered to attend a mandatory meeting per WSDOT to train their staff and resolve issues.  A snow storm occurred during the scheduled training and Plaintiff was forced to drive in hazardous snowy and icy conditions.  WSDOT employee Nicole

*Complaint- Page 11  of 23*

Knudson and Frank Green were reprimanded for Nicole for her traveling in these hazardous conditions.

## Events of January 30th and 31, 2017

January 30, 2017. Plaintiff continued to experience work place stress.  An email received from Nick Larson giving her "until 5 pm" to fix an issue that he had created with WSDOT re Jacobs limited access to WSDOT files caused work stress so severe that Plaintiff developed hives in the mouth and she experienced panic associated with her PTSD.

January 31, 2017, Plaintiff experienced a severe reaction to a meeting.   There was a large flow sheet that Plaintiff had worked on.  The flow sheet chart was presented without any credit to Plaintiff for her development of the project and chart.  She had worked since October 2016 setting up the project and it was during this meeting that she found out Jacobs would not be administering the contract, that Jacobs managers had assigned her to a "dead end" assignment. She showed Jeff Brown and Nicole Knudson the hives and told him she was leaving.  She immediately went to Urgent Care.

She applied for short term disability through her Integrated Disability Plan (IDP) covered by Standard Insurance Company.  She returned to Dr. Brender.

On February 27, 2017, Plaintiff received medical clearance from Dr. Brender stating that she could return to work on March 6, 2017, with limitations that she would need time off  for exacerbations.  The Doctor had previously recommended that Plaintiff not work with Jonathan Addison but Jacobs failed to engage in an interactive process to change the work environment or supervisory conduct or methods of Mr. Addison.

March 1, 2017.  The mental health provider report (requested by Standard Insurance Company) completed by Dr. Kim Braswell stated that Plaintiff had been treated since January 18, 2017 and that she was to return to work as of March 6, 2017.  Jacobs' ***hostile work environment is noted in the report***.  There still was no investigation or interactive process to correct the environment or to reach accommodations to allow Plaintiff to work and remain healthy.

**Forced Leave of Absence**

Jay Hueter called a meeting with Plaintiff on March 7, 2017, the day of her return to work.  Later, Plaintiff received a letter from Jacobs Engineering stating that she was placed on "Company Convenience Leave of Absence" effective March 6, 2017.  The letter stated that Plaintiff had 30 days to suspend or discontinue any of her benefits by completing a benefits enrollment/change form.  Plaintiff did not request to be placed on "Company Convenience Leave of Absence".  She was medically released and ready to return to work.

Plaintiff was forced out because of her WLAD /ADA protected activity and need for accommodation.  She foreseeably had a severe, disabling physical reaction to the forced leave of absence.  Adding insult to injury, Jacobs "offered" her a demotion to work under Dawn Gamler for at reduced pay as an overhead "assistant".  **This would have been a second demotion in status**.  Several fellow employees witnessed Colleen's reaction (crying and shaking) including Bill Hickey, Brian Panley, Hanna Berglund, and Kim Langenberg.  Jacobs still failed to correct the environment or accommodate her disability.  Plaintiff left the meeting visibly upset and without a final determination regarding her employment status.

On March 8, 2017, Plaintiff returned to Dr. Brender.  Dr. Brender noted work stress triggers of anxiety and PTSD with hives.  Dr. Brender noted similar symptoms had appeared on November 23, 2016.  Dr. Brender had noted that flare-ups and duration of related incapacity

might be 1 x per 5 months for 5 days per episode.   Dr. Brender noted Plaintiff was now unable to work due to employment related conditions.

On March 28, 2017, Dr. Kim Braswell stated that Plaintiff was unable to function in daily activities, overwhelmed, felt unsafe, anxious, and ruminates about past trauma.   Suicidal ideation.   Plaintiff's treatment plan included returning to previous level of functioning after alleviating symptoms of depression and PTSD.   Individual therapy, group therapy, and psychiatry visits.   **Dr. Braswell noted again of the hostile work environment contributing to symptomology and triggering PTSD and severe recurrent major depression.**

Shortly thereafter, Jacobs sent Plaintiff a letter advising that they were placing her on Company Convenience Leave of Absence.   Jacobs has not returned Plaintiff to work and she remains disabled from work.

Based on the aforementioned, the Plaintiff is a 45-year old Sr. Project/Controls Manager who has been the victim of a hostile work environment based on gender, retaliation and a failure to accommodate her disability. Jacobs Engineering (hereafter "Jacobs"), is a predominately male dominated company, which failed on several occasions to defuse or remedy Plaintiff's hostile work environment.   Defendant's managers lack training and lack insight on appropriate interactions with female employees.   Managers used gender based different treatment and inappropriate conduct to harm and discriminate against female employees.   Their actions have resulted in permanent damages to Plaintiff's career and mental health.

### III. Statement of Allegations

The Washington Supreme Court has repeatedly stated that the Washington Law Against Discrimination [WLAD] expresses a **public policy of highest priority**.   The legislature enacted the WLAD to eliminate and prevent discrimination in Washington.   The legislature has directed

*Complaint- Page 14  of 23*

that the provisions of the WLAD shall be construed liberally for the accomplishment of the purposed thereof.

**Disability Discrimination**

There are three recognized ways of proving disability discrimination under WLAD 49.60.180; and hostile work environment discrimination, failure to make reasonable accommodation including a mandatory duty to engage in an interactive process with the employee about accommodations, and different treatment discrimination. It is unfair practice for any employer, employment agency, labor union, or other person to:

1.  Refuse to hire, discharge, bar from employment, or otherwise discriminate against an able worker with a disability…; or

2.  Fail to refuse to make reasonable accommodation for an able worker with a disability…, unless to do so would impose undue hardship (please see WAC 162-22-065 and 162-22-075); or

3.  Refuse to hire or otherwise discriminate against an able worker with a disability because the employer would be subject to the requirements of this chapter if the person were hired, promoted, etc.

**1. Allegation of Hostile work environment discrimination allegation.**

The WLAD supports a disability based hostile work environment claim. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 43, 59 P.3d 611 (2002). This claim parallels the gender based hostile work environment claim but is based on the response of Defendant's managers, supervisors and coworkers to Plaintiff's cumulative post traumatic disabilities, and offensive conduct or comments because of her disability.

**2. Allegation of Reasonable Accommodation discrimination**

WLAD requires an employer to reasonably accommodate a disabled employee unless the accommodation would pose an undue hardship. RCW 49.60.180(2); *Pulcino v. Fed. Express Corp.*, 141 Wash.2d 629, 639, 9 P.3d 787 (2000), overruled in part on other grounds by *McClarty v. Totem Elec.*, 157 Wash.2d 214, 228, 137 P.3d 844 (2006).[6] A reasonable accommodation must allow the employee to work in the environment and perform the essential functions of her job without substantially limiting symptoms. See, e.g., *Griffith v. Boise Cascade, Inc.*, 111 Wash.App. 436, 442, 45 P.3d 589 (2002). To accommodate, the employer must affirmatively take steps to help the disabled employee continue working at the existing position or attempt to find a position compatible with the limitations. *Griffith*, 111 Wash.App. at 442, 45 P.3d 589 (2002)     Defendants did not allow plaintiff to work in an environment and perform the essential functions of her job by limiting her symptoms, but rather, worsened her symptoms.

In cases where an objective standard is not available to measure whether an accommodation is effective, a good faith Goodman interactive process is especially important. During that process, the duty to accommodate is continuing. *Frisino v. Seattle School Dist.* 160 Wash.App. 765, ___, 249 P.3d 1044, 1051 (2011)

To establish an employer's  duty to provide a reasonable accommodation, the plaintiff must prove . . . that the plaintiff either requested of the defendant an accommodation due to a disability," or, in the alternative, that "the defendant knew or had reason to know that the plaintiff has a disability, was experiencing workplace problems because of the disability.  "[r]easonable accommodation. . . envisions an exchange between employer and employee where each seeks and shares information to achieve the best match between the employee's capabilities and available positions." *Goodman v. Boeing Co.*, 127 Wn.2d 401, 408-409, 899 P.2d 1265 (1995)

WLAD and the ADA require employers to engage in an interactive process when a disabled employee requests an accommodation or when the employer recognizes the employee's need for an accommodation. *Snyder v. Medical Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 239, 35 P.3d 1158 (2001), and see *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1113 (9th Cir. 2000) (vacated on other grounds, 535 U.S. 391 (2002)). The Ninth Circuit, en banc, described the employer's role in the required mandatory "interactive process" stating: [W]e join explicitly with the vast majority of our sister circuits in holding that the interactive process is a mandatory rather than a permissive obligation on the part of employers under the ADA and that this obligation is triggered by an employee or an employee's representative giving notice of the employee's disability and the desire for accommodation. *Barnett*, supra at 1113. The interactive process requires (1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002).

### 3. Allegation of Different Treatment Discrimination based on Disability.

To prove disparate treatment discrimination based on disability, Plaintiff establishes that 1) she has a disability; 2) management knew or should have known of the disability; 3) she was doing satisfactory work; 4) she was treated differently than non-disabled others or treated adversely based on manifestations of the disability. See *Gambini v. Total Renal Care*, 486 F.3d 1087, 1094-95 (9th Cir. 2007) Disability encompasses psychiatric as well as physical conditions.

Jacobs not only reduced plaintiff in duties and rank; and held her back in advancement, but also placed her on involuntary leave without reasonable accommodation or remedy of discriminatory environments each of which would have allowed her to remain at work. Jacobs'

unlawful treatment caused the degradation of and end of her employment. Plaintiff's remote history of Post-Traumatic Stress Disorder had in no way prevented her performance of high stress professional full-time work for Jacobs until the events cited above. Jacobs pretextual leave of absence on which Plaintiff was placed occurred when Plaintiff was fully released to return to work from disability leave. Further Jacobs was notified that her disability was the result of working in their hostile work environment. Jacobs Engineering chose to ignore Plaintiff's medical reports and wrongful placed her on a "Company Convenience Leave of Absence" effective March 6, 2017.

Jacobs defied the law and injured Plaintiff when she was most vulnerable and was in desperate need to return to her job. Jacobs refused to abide by the law and stop the harassers, stop the discrimination, and refused to provided a corrected work environment and accommodation. Rather than investigate and remediate the discrimination or accommodate her disabilities and return her to work, Jacobs Engineering forced Plaintiff into a "company convenience" leave/ aka termination. This de facto termination is prohibited by RCW 49.60.180 et. seq. and WAC 162-22-090; as well as the Americans with Disabilities Act and the EEOC Guidelines. Plaintiff has filed with EEOC, exhausting her administrative remedies and clearing the way to file in Federal Court.

**4. Allegation of Gender Discrimination and Gender Based Hostile Work Environments**

Washington State and Federal law prohibit discrimination based on sex, gender or marital status. Both WLAD and Federal law prohibit gender based hostile work environments. Both laws provide the full attorney fees and costs to the prevailing injured party.

A gender based hostile work environment, different treatment based on gender and retaliation discrimination violate RCW 49.60.180. It is unlawful to discriminate against any

person in compensation or in other terms or conditions or employment because of sex or physical, emotional, or mental disability… [emphasis added].

A hostile work environment is created when an employee is subjected to offensive comments and/or conduct based on sex or gender, which are severe or pervasive enough to alter the work environment, and where any manager of the company participated or where the company knew or should have known.

The evidence set forth above shows that Jacob's Engineering is liable for a pervasive and severe hostile work environment for Plaintiff, as well as other employees, which the evidence indicates is based in whole or in part on gender. Glasgow v. Georgia-Pacific Corp, 103 Wash.2nd 401, 693 P.2d. 708 (1985).

In this case there is no need to even prove "notice" to the company because managers were primary perpetrators and witnesses to the outrageous conduct causing her damage to her career, distress, damages and aggravating her disabilities. There is a history of different treatment of female managers as well as pervasive, known sexual and gender-based offensive conduct in the work environment. The harassment Plaintiff experienced was unwelcome, gender-based, participated in and known to management, and it affected the terms and conditions of her employment.

The actions of Plaintiff' managers and coworkers are not casual, isolated nor trivial manifestations of the discriminatory environment. The actions were severe and persistent resulting in long term psychological damage to Plaintiff. Women who experience hostile and abusive environments at work are faced with an imbalance of power and a situation in which an "an employer implicitly, but effectively, [makes] their endurance of sexual intimidation a

condition of their employment."   Glasgow v. Georgia Pacific Corp., 103 Wn.2d 401, 405, 693 P.2d 708 (1985).

The environment becomes even more severe and damaging the employer inflicts suffering in retaliation for opposing or standing up to or complaining about discriminatory or  offensive conduct in the work environment. RCW 49.60.210.   The evidence we have documented shows that Jacobs Engineering was put on notice of adverse treatment constituting retaliatory action making the hostile work environment for Plaintiff and other female employees even more damaging.

Plaintiff was the victim of this retaliatory environment (along with other age and disability discrimination discussed above) from 2009-2017.   Jim Pace, David Gunn and Jonathan Addison created a gender based hostile work environment.   Plaintiff was repeatedly treated as an "assistant to" managers rather than a long term professional manager.

Witnesses testify that Mr. Gunn's disparate treatment of female employees included seeing female workers as sexual "objects" and required them to kiss him on the lips when he greeted them and referred to the females in his office as "girls".   Management forced Plaintiff to participate in offensive activities described above including but not limited to  kissing Mr. Gunn on the lips when greeting; and acting subservient and  deferential to Mr. Pace as an "ego booster female assistant listening to discussion of his sexual history and  who was "hot for him".  She was directed to provide false information to colleagues to enhance Mr. Pace's ego.

Mr. Gunn did not greet any male employees in the same manner and did not refer to them as "his boys".  Mr. Pace did not ask male employees to be subservient below their appropriate job positions; did not direct them to respond to rumors about him with false information so that he could appear in positive light; he did not discuss with other males whether he thought various

*Complaint- Page 20  of 23*

males had been victims of domestic or sexual violence. Mr. Pace sexualized the work environment for women in violation of the law, discussing what women were "hot for him" in the office and commented "have you seen how she looks at me" creating a hostile work environment for plaintiff.

On March 7, 2016, Jonathan Addison isolated and humiliated, shunned and defacto demoted Plaintiff from her managing role and treated her as an administrative assistant. Her pay remained the same but she lost significant job status. Mr. Addison continued his attack on Plaintiff, placing her in a cubicle in Bellevue, segregating and isolating her from her team. Mr. Addison told staff and clients that Plaintiff was not to be talked to by anybody. Mr. Addison wanted Plaintiff to be discriminated against and retaliated against, to be "put in her place". Mr. Addison was abusive (yelling and screaming) and hostile (threatening tone and posture) and causing severe life-threatening exacerbation of her PTSD. Female employees validate that Addison's gender hostility and punishment of Plaintiff aggravated her disability.

The conduct of Jacobs Engineering management was discriminatory harassment sufficiently serious to alter the conditions of Plaintiff's employment and constitute an abusive working environment. Jacobs Engineering had knowledge of this environment and failed to take corrective actions against supervisors and managers.

### 5. Allegation of Retaliation in violation of RCW 49.60.210.

To prove a claim of retaliation discrimination, the plaintiff contends Jacobs Engineering retaliated against Plaintiff, putting her into a grossly inferior work setting and duties; and then putting her on indefinite leave of absence after they found out she was complaining of a hostile work environment and seeking disability accommodation. The retaliation included a demotion in

job status, separation from her team, assignment to an unhealthy rat-infested work environment, and then indefinite involuntary leave (aka termination).

Therefore, defendant retaliated against plaintiff in violation of RCW 49.60.210.

### IV. Requested Relief

1.  Under Washington law a jury may award unlimited economic losses as well as unlimited "general damages" for the suffering of discrimination and retaliation.  Under Federal law the jury may award up to $300,000 per "violation" as punitive damages.  Therefore, plaintiff seeks $300,000 per violation.

2. Under the law, Jacobs may be required to "make plaintiff whole" for the discrimination and retaliation she has suffered. Attorney fees and costs of suit are recoverable to the injured employee.  Therefore, plaintiff seeks damages for discrimination and retaliation she has suffered, attorney fees and costs.

3.  Plaintiff has suffered a significant financial hardship losing management level career employment that provided Plaintiff's gross wages of $10,074.08 per month even under discriminatory conditions. Plaintiff has been in a hostile work environment from 2009 thru 2017. Jacobs' devastation of her employment and health has taken her from a high-level project manager to nearly unemployable. She notified Jacobs' supervisors, management, ethics and HR repeatedly without intervention, investigation, remedial action or accommodation. Witness testimony establishes that Plaintiff was a long-term, committed employee of Jacobs Engineering. Records show that her work performance exceeded expectations and she was a valuable member of the Jacobs team functioning at a management level until these horrific events.  And it can be assumed that her wages would have remained and continued to increase as they had in 2010-2015.

*Complaint- Page 22  of 23*

Therefore, at this time Plaintiff struggles to regain her health and in the future will struggle to find replacement employment, leading to a loss of future income in the amount of over $120,000 per year plus benefits valued at 25% of earnings together with  past and future lost wages alone at this time are estimated at over $500,000.

4. Witnesses and medical providers confirm that Plaintiff has experienced significant emotional distress as a result of Jacobs Engineering actions.  Such treatment over time with such damage warrants substantial compensation.  Therefore, plaintiff seeks general damages for pain and suffering, including, emotional distress, loss of enjoyment of life, business reputation and other damages as the court finds and attorney's fees and costs, in the amount of $1,300,000.00

Dated: ___1/10/2019___         _____
                               Signature of Plaintiff
                               Colleen Parris

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

Signed at (city) Kent (state) Washington on (date) __1/10/2019__ .

_____        COLLEEN K. PARRIS
Signature of Plaintiff           Print or Type Name

*Complaint- Page 23  of 23*